# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**JANNETTE HERNANDEZ-MENDEZ,**

**Plaintiff,**

**v.**

**CIVIL NO. 15-1147 (GAG)**

**BENJAMIN RIVERA, et al.,**

**Defendants.**

## OPINION AND ORDER

Jannette Hernández-Méndez ("Hernández") brings this sex-based employment discrimination and retaliation action against the Commonwealth of Puerto Rico and the Family Department of the Commonwealth of Puerto Rico (collectively "Family Department") and two supervisors at the Family Department, Benjamin Rivera ("Rivera") and Marisel Rodríguez ("Rodríguez") in their personal and official capacities (collectively "Defendants"). (Docket No. 1.)

Hernández seeks redress for alleged violations of federal and local anti-discrimination and anti-retaliation employment statutes. Hernández raises hostile work environment and retaliation claims under Title VII of the Civil Rights Act of 1994, 42 U.S.C. § 2000e *et. seq.* ("Title VII"). Id. Hernández also invokes this court's supplemental jurisdiction and brings three claims under Puerto Rico state law: Law 17 of April 1988, P.R. LAWS ANN. tit. 29, §§ 155-155m (sexual harassment) ("Law 17"); Law 69 of July 6, 1985, P.R. LAWS ANN. tit. 29, §§ 1321-1341 (gender discrimination) ("Law 69"); Law No. 115 of December 20, 1991, P.R. LAWS ANN. tit. 29, § 194a, *et seq.* (retaliation) ("Law 115"). Id.

Pending before the Court is Defendants' motion for summary judgment. (Docket No. 50.) Hernández responded in opposition. (Docket No. 66.) Defendants replied. (Docket No. 78.) Upon

review of the submissions of the parties and applicable law, Defendants' motion for summary judgment at Docket No. 50 is **DENIED.**

## I. Relevant Factual and Procedural Background

The Court states the facts in the light most favorable to Hernández, the nonmovant.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Unless otherwise noted, the facts are not disputed by the parties for summary judgment purposes.  See L. Cv. R. 56(e) (properly supported facts deemed admitted for summary judgment, unless properly controverted).

Hernández began working at the Family Department in 1994.  (Defendants' Statement of Uncontested Material Facts, Docket No. 51, ¶ 1) (hereinafter "DSUMF").  In April 2013, Hernández was transferred to the Aguadilla I local office within the Family Department.  (DSUMF ¶¶ 5-6; Plaintiff's Response to Defendants' Statement of Uncontested Material Facts, Docket No. 66-1 ¶¶ 5-6) (hereinafter "PRSUMF").  Hernández was the secretary for the director of the Aguadilla I local office.  (DSUMF ¶ 25; PRSUMF ¶ 25.)  At that time, Rivera was the acting director of Aguadilla I.  (DSUMF ¶ 21; PRSUMF ¶ 21.)  Rivera was new to this position, too; he was appointed acting director of Aguadilla I in January 2013.  (Docket No. 81-1, at 2.)

The organizational structure of the Family Department is important to understanding the individuals involved in this case.  Rivera, as director of the local office, was responsible for managing the day-to-day affairs at the Aguadilla I local office.  (Docket No. 66-2, at 14-15.)  Rivera was Hernández's supervisor at Aguadilla I.  (Docket Nos. 51-1, at 19; 66-2, at 38.)  However, Rivera did not have the authority to hire, terminate, promote, transfer, or award salary raises to the employees under his supervision at Aguadilla I.  (DSUMF ¶¶ 93-96; PRSUMF ¶¶ 93-96.)  Rivera's supervisor, in turn, was Rodríguez, who held the position of regional director for the Family Department, and oversaw the affairs of multiple local offices within her designated region.

(DSUMF ¶ 103; PRSUMF ¶ 103.)   Rodríguez possessed the authority to relocate and transfer employees within the local offices under her supervision.   (DSUMF ¶ 132; PRSUMF ¶ 132.) However, Rodríguez lacked the authority to promote, demote, or terminate employees.   (DSUMF ¶¶ 133-35; PRSUMF ¶¶ 133-35.)   Only the Secretary for the Family Department has the authority to promote, terminate, or award raises to Family Department employees.   (DSUMF ¶¶ 129-31; PRSUMF ¶¶ 129-31.)

All of the interactions between Hernández and Rivera relevant to this case occurred during the month-long period Hernández was assigned to Aguadilla I as Rivera's secretary.   Shortly after Hernández began her new position as Rivera's secretary, Rivera called Hernández into his office. (DSUMF ¶ 22; PRSUMF ¶ 22.)   Rivera asked Hernández whether she had "special friend"[1] or a boyfriend.   (DSUMF ¶ 22; PRSUMF ¶ 22.)   Hernández replied that she did not, that she was married but separated from her husband, and walked out of Rivera's office.   (DSUMF ¶ 22; PRSUMF ¶ 22.) After that conversation, Hernández felt uncomfortable and mad.   (Plaintiff's Statement of Uncontested Material Facts, Docket No. 66-1, at 15 ¶ 6) (hereinafter "PSUMF").

A few days later, Rivera approached Hernández at her desk and asked her age.   (DSUMF ¶ 28; PSUMF ¶ 7.)   Hernández was surprised by the question, and answered that she was forty years old.   (DSUMF ¶ 28; PSUMF ¶ 7.)   In response, Rivera leaned in close to Hernández and told her that she was "very hot"[2] for her age.   (DSUMF ¶ 28; PSUMF ¶ 7.)   This interaction left Hernández feeling uncomfortable and angry.   (PSUMF ¶ 8.)

---

[1] In the translated EEOC charge, Hernández recounts that Rivera asked whether she had a "close friend or boyfriend."   (Docket No. 16-1, at 1.)   The precise phrasing of Rivera's question is not dispositive, and the parties do not dispute the general nature of Rivera's question.

[2] Once again, the translations of this precise phrase vary.   For instance, the translated EEOC charge reads: "frankly, for your age, you look very well."   (Docket No. 16-1, at 1.)   However, the central message of the comment is undisputed summary judgment purposes.

The third encounter occurred about two weeks later. On May 3, 2013, Rivera approached Hernández's desk and asked her to retrieve a document for him. (DSUMF ¶ 32; PSUMF ¶ 9.) Hernández stood up and went to the file cabinet to locate the document. (DSUMF ¶ 32; PSUMF ¶ 9.) While looking for the document, Hernández felt Rivera's body pressed up against her back from behind. (DSUMF ¶ 32; PSUMF ¶ 9.) In response, Hernández immediately walked away from her desk area without making any comments to Rivera. (DSUMF ¶ 32; PSUMF ¶ 9.) Following the encounter, Hernández was nervous and felt that she was going to cry. (PSUMF ¶ 10.) Hernández then approached a trusted colleague, Rosa Pérez ("Pérez"), to tell her what happened. (Docket No. 51-1, at 22.) Pérez was a local supervisor at Aguadilla I, but she did not supervise Hernández. Id. at 18, 20, 22. Pérez suggested that Hernández should disclose the incident to their union representative and file a grievance to report Rivera's conduct. Id. at 22.

After speaking with Pérez, Hernández left the local office and called Maria Santiago ("Santiago"), the employee's union representative. Id. at 17, 42. Santiago suggested that Hernández submit a grievance regarding Rivera's conduct. (DSUMF ¶ 35; PRSUMF ¶ 35.) Santiago then called Rodríguez, the regional director for the Family Department, to schedule an appointment to address the situation and report Rivera's harassing behavior. (Docket No. 70-4 at 1-2; DSUMF ¶ 36; PRSUMF ¶ 36.) Rodríguez is Rivera's immediate supervisor. (Docket No. 81-1, at 2.)

The meeting with the regional director took place the same day. (PSUMF ¶ 14; see also Docket No. 51-1, at 76.) Four people attended the meeting: Hernández, Santiago (the union representative), Rodríguez (the regional director), and Margarita García (the secretary to the regional director).[3] (DSUMF ¶ 39; PRSUMF ¶ 39.) Hernández was uncomfortable about García's presence

---

[3] Hernández claims Waleska González-Pérez, the human resources coordinator for Family Department responsible for handling sexual harassment claims, did not attend this meeting. (Docket No. 51-1, at 54-55.) The meeting minutes, which list González-Pérez as present, contradict this claim. (Docket No. 70-4.)

at the meeting because she believed García and Rivera were close friends. (PSUMF ¶ 18; see also Docket Nos. 51-1, at 68; 70-3 at 3.) At some point during the meeting, Rodríguez indicated to Hernández that Rivera should be present, which Hernández adamantly refused because Rivera's presence made her nervous. (Docket Nos. 51-1, at 54-55; 70-3, at 3.)

During the meeting, Hernández described the three interactions that took place between her and Rivera.[4] (DSUMF ¶ 40, PSUMF 14; see also Docket No. 51-1 at 53-54.) Hernández also described a fourth incident: she asked Rivera to move a filing cabinet to create more space around her desk, Rivera initially declined, and then eventually moved the cabinet in a manner that Hernández perceived as rude. (PSUMF ¶ 12; see also Docket Nos. 51-1 at 59; 72-1 at 2.) Finally, Hernández described Rivera's constant looks and gazes in her direction, which made her uncomfortable. (PSUMF ¶ 11.) García took the meeting minutes. (PSUMF ¶ 17; Docket No. 70-4.)

The net effect of the May 3rd meeting was twofold. Regional director Rodríguez determined that Hernández would be transferred to the Aguadilla II local office, beginning on the following Monday. (DSUMF ¶ 40; PRSUMF ¶ 40.) Hernández filed a formal sexual harassment complaint with the Family Department at the conclusion of the May 3rd meeting. (Docket No. 72-1.)

Aside from being transferred to a position she did not want, Hernández experienced spells of anger, sadness, depression, crying, and work-related anxiety after May 2013. (PSUMF ¶ 1.) This prompted Hernández to seek treatment from a psychologist and a psychiatrist. Id. at ¶ 2-4. She visited the psychiatrist regularly for about a year. Id. at ¶ 4. Hernández was diagnosed with depression and prescribed medication for her condition. Id.

---

[4] The parties dispute whether Hernández described the May 3, 2013 incident with Rivera during the May 3, 2013 meeting. Defendants claim Hernández omitted this incident, and point to Garcia's meeting minutes in support. (Defendants' Reply Statement of Undisputed Material Facts, Docket No. 78-1, ¶ 14.) Hernández claims she described the May 3rd incident in the meeting, and that it was somehow excluded from the meeting minutes.

On October 3, 2013, following Hernández's May 3rd sexual harassment complaint, the Family Department conducted a formal interview with Hernández. (Docket No. 72-2.) The October 3rd interview was part of an internal investigation conducted by the Family Department. (Docket No. 51-1, at 65.) In the October 3rd interview, Hernández essentially repeated her interactions with Rivera in the Aguadilla I local office: the marital status question; the 'hot-for-her-age' remark; the incident of physical contact; the constant uncomfortable looks; and rude way Rivera responded to Hernández's request to rearrange the filing cabinet. (Docket No. 72-2, at 5-6.)

On November 11, 2013, Hernández filed a Charge of Discrimination with the Puerto Rico Department of Labor Antidiscrimination Unit and the Equal Employment Opportunity Commission ("EEOC"). (Docket Nos. 51-6 at 1; 70-3.) The EEOC charge repeated the events as previously recounted by Hernández in the May 3rd and October 3rd meetings. The EEOC sent Hernández a Notice of Right to Sue letter on November 24, 2014, which she received on November 29, 2014. (Docket No. 1, ¶¶ 5-6.)

Hernández filed this complaint on February 18, 2015. (Docket No. 1.) Defendants moved to dismiss for failure to state a claim under Rule 12(b)(6). (Docket No. 11.) On September 30, 2015, the Court granted in part and denied in part Defendants' motion to dismiss. Hernández-Méndez v. Rivera, 137 F. Supp. 3d 142, 161 (D.P.R. 2015). The Court dismissed the following claims: (1) Title VII claims of sexual harassment and retaliation against Rivera and Rodríguez in their individual capacity (but not their official capacity), (2) any section 1983 claims; (3) the Law 115 claims against Rivera and Rodríguez in their personal capacities; and (4) any claims for monetary damages against the Family Department or Rivera and Rodríguez in their individual capacities. Id.

Following the motion to dismiss stage, five categories of claims remain: (1) Title VII sexual harassment against the Family Department (through the official capacity Defendants); (2) Title VII

retaliation against the Family Department (through the official capacity Defendants); (3) Law 17 claims against all remaining Defendants; (4) Law 69 claims against all remaining Defendants; and (5) Law 115 claims against the Family Department (through the official capacity Defendants). Id.

## II. Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also FED. R. CIV. P. 56(a). "An issue is genuine if 'it may reasonably be resolved in favor of either party' at trial, . . . and material if it 'possess[es] the capacity to sway the outcome of the litigation under the applicable law.'" Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (citations omitted). The movant bears the initial burden of demonstrating the lack of evidence to support the nonmovant's case. Celotex, 477 U.S. at 325. Then, burden then shifts back to the nonmovant, who must establish at least one issue of fact that is both genuine and material. Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994).

The nonmovant may establish a fact is genuinely in dispute by citing particular evidence in the record or showing that the material cited by the movant "do[es] not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(B). If the Court finds that some genuine factual issue remains, the resolution of which could affect the outcome of the case, then the Court must deny summary judgment. Liberty Lobby, 477 U.S. at 248.

The Court views the evidence in the light most favorable to the nonmovant, resolving all reasonable inferences in that party's favor, without making any credibility determinations or

weighing the evidence. <u>Id.</u> However, summary judgment is appropriate when the nonmovant's case rests merely upon "conclusory allegations, improbable inferences, and unsupported speculation." <u>Forestier Fradera v. Municipality of Mayagüez</u>, 440 F.3d 17, 21 (1st Cir. 2006) (citation omitted).

**III. Discussion**

Hernández alleges hostile work environment and retaliation claims under Title VII and analogous claims under Puerto Rico state law. The factual record provides sufficient support to create genuine issues of material fact on each of Hernández's claims. Accordingly, the factfinder—not the Court—must resolve those factual issues. As explained below, Defendants motion for summary judgment is **DENIED**.

A. <u>Governing Federal Law: Title VII</u>

Title VII prohibits employers from discriminating "against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). The phrase "terms, conditions, or privileges of employment" reflects the congressional intent to "strike at the entire spectrum of disparate treatment of men and women in employment." <u>Pérez-Cordero v. Wal-Mart P.R., Inc.</u>, 656 F.3d 19, 25-26 (1st Cir. 2011) (citing <u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. 57, 64 (1986)) (citations and quotations omitted). In accordance with that comprehensive aim, Title VII also prohibits employer retaliation against an employee who opposes discriminatory employment practices. 42 U.S.C. § 2000e–3(a).

Title VII's substantive provision protects individuals based on who they are, *i.e.*, their status. <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 63 (2006). Courts have recognized various types of actionable sexual harassment claims, including quid pro quo harassment claims and hostile work environment claims. <u>See, e.g.</u>, <u>Acevedo Torres v. Arecibo</u>, 857 F. Supp. 2d 231, 234 (D.P.R.

2012); Pérez-Cordero, 656 F.3d at 26; Valentin-Almeyda v. Municipality of Aguadilla, 447 F.3d 85, 94 (1st Cir. 2006). Quid pro quo and hostile work environment claims are not independent categories; rather, they are descriptions of "alternative approaches to proving sex-based employment discrimination." Pérez-Cordero, 656 F.3d at 26 (citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 751-52 (1998).

By contrast, Title VII's anti-retaliation provision protects individuals based on their conduct, rather than their status. Burlington N. & Santa Fe Ry. Co., 548 U.S. at 63. Accordingly, a retaliation claim differs from harassment claim by protecting employee conduct (not status) and targeting retaliatory animus (not discriminatory animus). Despite these differences, when the evidence can be reasonably viewed as "demonstrating either discriminatory animus or retaliatory animus," it is appropriate to consider the same evidence to support the sufficiency of each claim. Pérez-Cordero, 656 F.3d at 32.

Hernández raises both types of claims—sexual harassment and retaliation—under Title VII. The Court addresses each claim in turn.

**B. Hostile Work Environment under Title VII**

Under Title VII, sex-based discrimination includes "requiring people to work in a discriminatorily hostile or abusive environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). A hostile work environment is created—and Title VII is thereby violated—"[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult," to an extent "that is sufficiently severe or pervasive to alter the conditions of employment." Id. (internal citations and quotations omitted).

To succeed on a Title VII hostile work environment claim, plaintiff must establish six elements: (1) that she is a member of a protected class; (2) that she was subjected to unwelcome

sexual harassment; (3) that the harassment was based on sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that the sexually objectionable conduct was both objectively and subjectively offensive (*i.e.*, a reasonable person would find it hostile or abusive, and the victim did, too); and (6) that some basis for employer liability has been established. Forrest v. Brinker Intern. Payroll Co., 511 F.3d 225, 228 (1st Cir. 2007) (internal quotations omitted).

For a hostile work environment claim, "the fourth and fifth elements are typically the most important." O'Rourke v. City of Providence, 235 F.3d 713, 728 (1st Cir. 2001). This inquiry is highly fact-specific, and must be determined "in light of the record as a whole and the totality of the circumstances." Id. at 729 (citing Meritor, 477 U.S. at 69); Marrero v. Goya of P.R., Inc., 304 F.3d 7, 19 (1st Cir. 2002). A court has some latitude in evaluating the conduct in question, and should consider factors such as "the frequency of the discriminatory conduct; its severity; whether it is threatening or humiliating, or merely an offensive utterance; and whether it unreasonably interferes with the employee's work performance." Harris, 510 U.S. at 21. Each of these factors are important, but weighing them is not a science. There is no "mathematically precise test" for determining the severity and pervasiveness of the harassment or the hostile and abusive environment in the workplace. Pérez v. Horizon Lines, Inc., 804 F.3d 1, 6 (1st Cir. 2015). In short, context matters.

The first three elements of Hernández's hostile work environment claim are essentially undisputed. Hernández, a woman, is a member of a protected class. See, e.g., Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998) (Title VII includes men and women within its protections). Rivera's harassing comments and actions towards Hernández were unwelcome. In each instance, she either responded negatively to Rivera or did not respond at all. Then, on May 3, 2013, Hernández confided in a trusted coworker, called her union representative, and initiated a

meeting with Rodríguez to report the unwelcome encounters. The third element is satisfied because Rivera's harassment of Hernández was gender specific: he asked her relationship status in a suggestive way; he told her that she was attractive for her age; and he pressed himself up against her from behind. As Hernández describes it, Rivera was hitting on her. A jury could reasonably find not only that Rivera's harassing behavior was gender-specific, <u>Forrest</u>, 511 F.3d at 229, but also that it was motivated by sexual desire. <u>See</u> <u>Oncale</u> 523 U.S. at 80.

Turning to the fourth hostile work environment element, Defendants argue the Rivera's comments and actions were not severe or pervasive, and even if they were, Rivera's harassing behavior did not alter the conditions of Hernández's employment. (Docket No. 50, at 10-12.) Here, Defendants color the facts quite differently from Hernández. However, the Court views the facts in Hernández's favor, and in this light, Defendants' argument fails.

First, Defendants point to timing of the harassing events. Because all of Rivera's interactions with Hernández occurred in April 2013, Defendants argue the duration of the harassment was too brief to rise to the level of severe or pervasive harassment. <u>Id.</u> at 10. However, Title VII does not include a strict durational requirement for sex-based harassment. While Rivera's harassing conduct towards Hernández only last a month, Hernández only worked as Rivera's secretary for a month. From the moment Hernández begin work at the Aguadilla I local office until the day she was transferred, Rivera's harassing comments and actions were essentially constant. <u>See</u> <u>Marrero</u>, 304 F.3d at 19 (employees are not required "to suffer the constant attentions of a lascivious supervisor").

Second, Defendants argue that Rivera's harassing conduct was too insignificant to alter the conditions of Hernández's employment. (Docket No. 50, at 11.) Each incident—the relationship status inquiry, the 'hot-for-your-age' remark, and Rivera's physical contact with Hernández from behind—impacted Hernández personally: she reported feeling sad, angry, uncomfortable, and

crying.  Rivera's rudeness and constant stares directed at Hernández likely made an uncomfortable situation worse.  <u>Flood v. Bank of Am. Corp.</u>, 780 F.3d 1, 12 (1st Cir. 2015) ("[A]n act of harassment that is not actionable in and of itself may form part of a hostile work environment claim.") (quoting <u>Marrero</u>, 304 F.3d at 28).  Hernández responded by attempting to avoid her harassing supervisor.  This would have directly affected her work performance.  Defendants point out that Hernández kept working after the incidents (except that, after the May 3rd incident, she left the office).  Even so, a plaintiff's persistence or perseverance does not undermine a claim of sexual harassment.  An employee is not required to "falter under the weight of an abusive work environment" before the harassment claim becomes actionable.  <u>Pérez-Cordero</u>, 656 F.3d at 51.

As a parting blow, Defendants launch an *ad hominem* attack at Hernández, accusing her of frequent absences and laziness.  (Docket No. 50, at 10-12.)  But even if Hernández's performance was unsatisfactory (the record does not undisputedly show this—Defendants want to have it both ways, arguing Hernández's performance was both unchanged and unsatisfactory), a reasonable jury could find that Rivera's harassing behavior caused any unsatisfactory performance.  Thus, a jury could find the severe and pervasive element satisfied, so the Court presses forward to the next element of Hernández's hostile work environment claim.

Defendants contend that Rivera's conduct was not offensive enough to alter Rivera's work conditions.  This argument misses the mark, too.  Rivera's harassment involved non-consensual physical contact, sexual remarks, suggestive questioning, rudeness, and constant gazing and staring at Hernández.  This type of behavior would be unnerving for any employee, but it is especially troubling based on Rivera's position of power in the local office and Hernández's subordinate role as Rivera's secretary.  <u>See, e.g.</u>, <u>Billings v. Town of Grafton</u>, 515 F.3d 39, 50-51 (1st Cir. 2008) (vacating summary judgment on a hostile work environment claim brought by a female secretary

against a male supervisor where the supervisor's harassing conduct including staring but no physical contact). Moreover, Hernández immediate reporting of the incident on May 3rd demonstrates that she found Rivera's behavior subjectively offensive. After he pressed himself against her from behind, she left, asked a friend for advice, called the union representative, reported the events to the regional director, and filed a sexual harassment complaint, *all on that same day*. Thus, a jury could reasonably find Rivera's harassment of Hernández objectively and subjectively offensive.

The final element of a hostile work environment claim requires showing some basis for employer liability. Two distinct approaches to determining employer liability are relevant here. See Agusty-Reyes v. Dep't of Educ. of P.R., 601 F.3d 45, 53 (1st Cir. 2010) (citing Ellerth, 524 U.S. at 764). Under either approach, the result is the same. A jury could reasonably find the Family Department vicariously liable for Rivera's harassment of Hernández.

Under the first vicarious liability framework, an employer is vicariously liable for harassment by supervisor that results in a "tangible employment action" against the employee. Agusty-Reyes, 601 F.3d at 53. For purposes of Title VII vicarious liability, a supervisor is someone empowered by the employer to take a tangible employment action against the employee. Vance v. Ball State Univ., 133 S. Ct. 2434, 2439 (2013). Tangible employment action derives from the supervisor's authority to effect a "significant change in employment status." Id. at 2443 (quoting Ellerth, 524 U.S. at 761). These actions include: "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Id. The key to determining supervisory status, as confirmed by the Supreme Court in Vance, is "the degree of authority possessed by the putative supervisor." Velazquez-Pérez v. Developers Diversified Realty Corp., 753 F.3d 265, 271 (1st Cir. 2014) (citations omitted).

Under the second approach, an employer will be vicariously liable for a supervisor's "severe and pervasive" harassment, even if no tangible employment action resulted, unless the employer can avail itself of the <u>Faragher-Ellerth</u> defense. This affirmative defense requires a two-step showing: (1) the employer's actions to prevent and correct harassment were reasonable and (2) the employee's actions to avoid harm were not reasonable. <u>Agusty-Reyes</u>, 601 F.3d at 53 (citing <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 807 (1998); <u>Ellerth</u>, 524 U.S. at 765)) (further citations omitted).

For both approaches to vicarious liability, the threshold question is whether Rivera was Hernández's supervisor.[5] Rivera undisputedly exercised supervisory responsibility over Hernández. (DSUMF ¶ 90; PRSUMF ¶ 90; <u>see also</u> Docket No. 51-1, at 19; Docket No. 66-2, at 14-15.) However, Rivera lacked the authority to fire, promote, or transfer the employees he supervised, including Hernández. (DSUMF ¶¶ 93-96; PRSUMF ¶¶ 93-96.) Defendants insist this means Rivera was not Hernández's supervisor under <u>Vance</u>. (Docket No. 50, at 13.) <u>See</u> <u>Vance</u>, 133 S. Ct. at 2443 (holding that a supervisor is someone empowered to take "tangible employment actions against the victim"—that is, to effect a "significant change in employment status").

However, the Supreme Court's holding in <u>Vance</u> is not as ironclad as Defendants suggest. <u>Vance</u>'s holding was based on the recognition that modern organizations "have abandoned a highly hierarchical management structure"—vesting employees with "overlapping authority"—thus justifying a relatively narrow definition of supervisor. <u>Id.</u> at 2452. That factual assessment is inapposite here. The Family Department's management structure is highly hierarchical. Rivera, as the acting director of the Aguadilla I local office, managed and oversaw the affairs of the office on a day-to-day level. As Rivera's secretary, Hernández worked directly under Rivera's control and

---

[5] Rivera retired from his position as the acting director of the Aguadilla I local office on February 28, 2014. (DSUMF ¶ 88; PRSUMF ¶ 88.) In light of his retirement, Hernández seeks to be reassigned to her preferred position at the Aguadilla I local office.

supervision.  The structure of the workplace relationship between Rivera and Hernández was that of the traditional manager and assistant.

Vance recognizes that in situations where supervisory decision-making authority is remote and concentrated (as here), supervisors "will likely rely on other workers who actually interact with the affected employee" before taking any tangible employment action.  Id.  Accordingly, Vance's delegated authority exception applies where "the employer may be held to have effectively delegated the power to take tangible employment actions to the employees on whose recommendations it relies."  Id.  That exception applies here: Rivera's (and Rodríguez's) assessment of Hernández's performance is judgment upon which the hiring authority for the Family Department would rely. (DSUMF ¶¶ 129-131; PRSUMF ¶¶ 129-131.)  Thus, a jury could reasonably infer that if Rivera requested Hernández's termination or transfer, the Family Department would have effectuated Rivera's request.

Applying Vance's delegated authority exception, Rivera possessed sufficient authority to be considered Hernández's supervisor.  See Vance, 133 S. Ct. at 2452.  Accordingly, a reasonable jury could find that Hernández's actions in seeking to avoid further harassment were entirely reasonable, see Agusty-Reyes, 601 F.3d at 53, and thus the Faragher-Ellerth defense is inapplicable.  That means Hernández has established a genuine issue of material fact as to each element of a Title VII hostile work environment claim.  Defendants' motion for summary judgment as to Hernández's hostile work environment claim is **DENIED**.

C.  Retaliation under Title VII

Title VII prohibits employers from retaliating against an employee who opposes discriminatory employment practices.  42 U.S.C. § 2000e–3(a).  To show retaliation under Title VII, plaintiff must establish: (1) that she engaged in a protected activity; (2) that she suffered a

1   materially adverse employment action; and (3) a causal link between the protected activity and the

2   adverse action.  Collazo v. Bristol-Myers Squibb Mfg., Inc., 617 F.3d 39, 46 (1st Cir. 2010).  Once

3   plaintiff establishes a *prima facie* showing of retaliation, the burden shifts to defendant, who must

4   "articulate a legitimate, non-retaliatory reason" for the adverse employment action.  Id. at 46.  If

5   defendant can make this showing, the burden shifts to plaintiff once again.  At this stage, plaintiff

6   must "show that the proffered legitimate reason is in fact a pretext and that the job action was the

7   result of the defendant's retaliatory animus."  Pérez-Cordero, 656 F.3d at 31 (quoting Roman v.

8   Potter, 604 F.3d 34, 39 (1st Cir. 2010)) (further citations and quotations omitted).

9       The first element is easily resolved.  Hernández undertook a protected activity when she

10  reported Rivera's conduct on May 3, 2013.  See Pérez-Cordero, 656 F.3d at 31 (reporting

11  harassment to superiors is opposition to a discriminatory practice under Title VII).

12      The parties dispute whether Hernández suffered an adverse employment action when she

13  was transferred to the Aguadilla II local office.  The transfer was arguably adverse because a jury

14  could find the transfer affected and altered Hernández's workplace conditions.  See Burns v.

15  Johnson, 829 F.3d 1, 10 (1st Cir. 2016) (citing Morales-Vallellanes v. Potter, 605 F.3d 27, 35 (1st

16  Cir. 2010)) (discussing an adverse employment action in the context of a sex discrimination claim).

17  Defendants argue Hernández failed to object to the transfer, that transfers were routine, and that

18  this particular transfer was not adverse because Hernández's commute was only increased by six

19  minutes.  Hernández disputes these points, but even she did not, Defendants' arguments are

20  unavailing.  Hernández's transfer to a different office was material, and therefore actionable,

21  because a change of office, coworkers, supervisors, and day-to-day duties constitutes "reassignment

22  with significantly different responsibilities."  See Morales-Vallellanes, 605 F.3d at 35 (quoting

23  Ellerth, 524 U.S. at 761).

24

The third question is whether Hernández's "protected activity was a but-for cause of the alleged adverse action by the employer." <u>Xiaoyan Tang v. Citizens Bank, N.A.</u>, 821 F.3d 206, 221-22 (1st Cir. 2016) (quoting <u>Univ. of Tex. Sw. Med. Ctr. v. Nassar</u>, 133 S. Ct. 2517, 2534 (2013)). Hernández's protected conduct occurred on May 3, 2013, Rodríguez determined Hernández would be transferred on the same day, and Hernández began her duties at Aguadilla II the following Monday. The timing of Hernández's transfer supports a finding of causation. <u>See, e.g.</u>, <u>Collazo</u>, 617 F.3d at 50 (three complaints of harassment and plaintiff's termination occurred within two weeks, supporting the inference of causation). Temporal proximity may not be determinative standing alone, but when an adverse action follows closely after protected conduct, "the timing often is strongly suggestive of retaliation." <u>Noviello</u>, 398 F.3d at 86. Here, that strong suggestion is sufficient evidence from which a jury could reasonably infer a causal connection between Hernández's protected activity and adverse employment action.

In step two of the burden-shifting framework, an employer must show a legitimate, non-retaliatory reason for the employment decision. <u>Collazo</u>, 617 F.3d at 46. Legitimate business reasons for an employment decision may include, for example: corporate reorganization, office downsizing, or poor job performance. <u>Id.</u> at 50. However, Defendants argument does not fall into any of these categories. Instead, Defendants claim "safeguarding and protecting plaintiff" (*i.e.*, the victim) was the legitimate, non-retaliatory basis for Hernández's transfer. (Docket No. 50, at 17; <u>see also</u> DSUMF ¶ 108; PRSUMF ¶ 108.) Hernández had to be transferred after her complaint, Defendants argue, because Rivera's job duties and compensation was more complicated, making his transfer too difficult. (Docket No. 50, at 17-18.)

Presumably, the need to safeguard and protect Hernández refers to Rivera's harassing conduct. <u>Id.</u> If so, this evidence supports Hernández's hostile work environment claim, as

discussed above. If not, then this rationale appears either unnecessary or punitive. In this situation, where "the evidence can reasonably be viewed as demonstrating either discriminatory animus or retaliatory animus, [the Court] may consider the same evidence in assessing the sufficiency of both of the plaintiff's claims." See Pérez-Cordero, 656 F.3d at 32; Agusty-Reyes, 601 F.3d at 52-57 (escalating harassing behavior sufficient evidence for both the severe or pervasive element of sexual harassment, as well as a retaliation claim); Morales-Vallellanes, 605 F.3d at 37-40 (employer's conduct simultaneously probative of discrimination and retaliation claims).

Rodríguez undisputedly had the authority to transfer Hernández. But Rodríguez's authority to transfer, standing alone, is not evidence of a legitimate basis to transfer. Similarly, Hernández had been transferred between offices before, but that does not explain the May 3rd transfer. Hernández began working at Aguadilla I in April 2013 because that office had an urgent staffing need. (DSUMF ¶ 6; PRSUMF ¶ 6.) Nothing suggests the staffing need vanished a month later. When Hernández was transferred out of Aguadilla I, she lost the opportunity to contribute to the local office where her services were needed most. Additionally, Hernández's duties changed when she was transferred to Aguadilla II. Rather than perform secretarial work for the director of the local office, Hernández worked as a cashier in Aguadilla II. (Docket No. 51-1, at 34.)

The core retaliation inquiry is whether "a reasonable employee would have found the challenged action materially adverse." Burlington N. & Santa Fe Ry. Co., 548 U.S. at 68. Based on the evidence here, an objective observer in Hernández's position could have understood the immediate transfer to a different office in this context as an effort to "dissuade[ ] a reasonable worker from making or supporting a change of discrimination." See id. That means the employment action, for the purposes of summary judgment, was materially adverse. Thus, Defendants have failed to show a legitimate, non-retaliatory reason for Hernández's transfer, so the

Court does not address the third step of the burden-shifting framework. Defendants' motion for summary judgment on the Title VII retaliation claim is denied.

      D.  <u>Supplemental State Law Claims</u>

Defendants also seek summary judgment on Hernández's Law 17 and Law 69 claims.[6] Law 17 provides that sexual harassment in employment is an "illegal and undesirable practice." Tit. 29, § 155. Law 69 prohibits gender based employment discrimination. <u>Id.</u> § 1321. "Law 17 and 69 serve virtually the same purposes and outlaw essentially identical behavior, and Law 69's specific prohibition on gender discrimination overlaps with Law 17's bar on sexual harassment." <u>Gerald v. Univ. of P.R.</u>, 707 F.3d 7, 28 (2013) (citing <u>García v. Sprint PCS Caribe</u>, 841 F. Supp. 2d 538, 564 (D.P.R. 2012)).

Defendants raise two arguments for summary judgment on Hernández's Law 17 and Law 69 claims. First, Defendants incorporate their Title VII arguments and seek dismissal of Law 17 and Law 69 claims on the same basis. (Docket No. 50, at 19.) Second, Defendants argue the Law 17 and Law 69 personal capacity claims against Rivera and Rodríguez are time barred. <u>Id.</u> at 19-20.

Taking up the latter argument first, Rivera and Rodríguez claim they did not receive a copy of Hernández's EEOC charge within Puerto Rico's one-year statute of limitations period. Accordingly, Rivera and Rodríguez argue Hernández's failure to provide personal notice of the EEOC charge meant the limitations period was not tolled, so the Law 17 and Law 69 personal capacity claims are now time barred.

---

[6] Defendants do not seek summary judgment on Hernández's Law 115 claim. The Court previously dismissed with prejudice Hernández's claim under "Law 115 against Individual Defendants" and any Law 115 claim against the Commonwealth Defendants seeking monetary damages. <u>Hernández-Méndez</u>, 137 F. Supp. 3d at 161. Plaintiff's Law 115 claim for non-monetary relief against the Commonwealth Defendants continues.

A one-year statute of limitations applies to Law 17 and Law 69.  Tit., 29 § 155m; <u>Gerald</u>, 707 F.3d at 27 (citations omitted).  However, the filing of an extrajudicial claim—such as an EEOC complaint alleging sex discrimination in violation of Title VII—tolls the statute of limitations on equivalent state law claims, including Law 17 and Law 69 claims.  <u>Valentin-Almeyda</u>, 447 F.3d at 101 (citing Tit., 31 § 5303) (tolling a Law 17 claim); <u>Rodríguez-Torres v. Caribbean Farm Mfr.</u>, 399 F.3d 52, 61 (1st Cir. 2005) (tolling a Law 69 claim).  For the extrajudicial claim (<i>i.e.</i>, the EEOC charge) to toll the limitations period, two requirements must be satisfied: (1) identicality between the two claims; and (2) the defendant-employer must be put on notice of the claim against him.  <u>Gerald</u>, 707 F.3d at 27; <u>Valentin-Almeyda</u>, 447 F.3d at 101; <u>Rodríguez-Torres</u>, 399 F.3d at 61.  Here, Hernández's EEOC charge satisfied the identicality requirement.  <u>See, e.g.</u>, <u>Valentin-Almeyda</u>, 447 F.3d at 101-02 (an administrative charge naming defendant supervisor and stating the elements of discrimination, without specifically referencing Title VII or Law 17, sufficiently identical because Title VII and Law 17 are interpreted congruently).

Rivera and Rodríguez challenge the notice element.  Specifically, they insist Puerto Rico law requires that any individual capacity defendants receive actual, personal notice to toll the statute of limitations, and cite <u>Huertas-Gonzalez v. Univ. of P.R.</u>, 520 F. Supp. 2d 304, 318 (D.P.R. 2007) in support of that proposition.  (Docket No. 78, at 2-3.)  However, the First Circuit has previously indicated that Puerto Rico's notice requirement for tolling the statute of limitations is not as rigid as Rivera and Rodríguez suggest.  <u>See</u> <u>Valentin-Almeyda</u>, 447 F.3d at 100-02 (affirming district court denial of defendant's motion to dismiss on timeliness grounds); <u>Gerald</u>, 707 F.3d at 27-28 (declining to affirm a district court grant of summary judgment on timeliness grounds where the administrative charge was not in the record and where the record was devoid of evidence of actual notice).

The parties vigorously dispute whether Rivera and Rodríguez received, read, and understood the EEOC charge against them. Rivera and Rodríguez were named on Hernández's description of events attached to the EEOC charge. (Docket No. 70-3.) However, the record does not make clear whether Rivera and Rodríguez actually received or reviewed the EEOC charge. Hernández admits that she did not personally notify Rivera or Rodríguez of the EEOC charge. (DSUMF ¶¶ 68-75; PRSUMF ¶¶ 68-75.) Instead, Hernández contends Rivera and Rodríguez were on constructive notice of the EEOC charges, based on their actual notice of the May 3rd and October 3rd complaints, and because the EEOC charge was sent to the Family Department, where Rivera and Rodríguez would have received it. (Docket No. 66, at 16-17.) Indeed, based on the evasive the deposition testimony of Rivera and Rodríguez, there is at least an inference Rivera and Rodríguez knew they were named the EEOC charge, knew the charge was received by the Family Department, and knew enough not to look into the matter any further. (Docket Nos. 51-8, at 63-69; 66-2, at 85-89.)

As the Court previously stated at the motion to dismiss stage, the notice inquiry is "context-driven and fact-specific." Hernández-Méndez, 137 F. Supp. 3d at 159; see also Gerald, 707 F.3d at 27-28 (declining to affirm summary judgment dismissal as time based on an underdeveloped factual record). Even after discovery, the factual record is underdeveloped and unclear as to Rivera and Rodríguez's actual notice of the EEOC charge. Given this uncertainty, the jury must resolve the notice question. Hernández filed her EEOC charge on November 11, 2013, received her right to sue letter on November 29, 2014, and filed suit on February 19, 2015. Accordingly, Rivera and Rodríguez are not entitled to judgment as a matter of law on the grounds of timeliness.

Turning to the merits, Defendants are not entitled to summary judgment on the Law 17 or Law 69 claims for the same reasons set forth in the Court's analysis of the Title VII claims. The substantive law of Puerto Rico on sexual harassment closely tracks its federal counterpart and Title

VII precedent is used to construe local law.  <u>Gerald</u>, 707 F.3d at 28 (citation omitted).  Therefore, Defendants claims for summary judgment on Law 17 and Law 69 are denied.

**IV.** **Conclusion**

For the reasons set forth above, Defendants' motion for summary judgment at Docket No. 50 is **DENIED**.

**SO ORDERED.**

In San Juan, Puerto Rico, this 1st day of August, 2017.

*s/ Gustavo A. Gelpí*
GUSTAVO A. GELPI
United States District Judge